UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JEFFREY SCOTT SHERMAN,                    Case No. 10-CV-2062 (PJS/FLN)

                    Plaintiff,

v.                                                                    ORDER

RINCHEM COMPANY, INC.,

                    Defendant.

---

Philip G. Villaume and Jeffrey D. Schiek, VILLAUME & SCHIEK, P.A., for plaintiff.

V. John Ella and Gine K. Janeiro, JACKSON LEWIS, LLP, for defendant.

Plaintiff Jeffrey Scott Sherman was fired by his employer, defendant Rinchem Company, Inc. ("Rinchem"), after he allegedly lied in the course of the company's investigation of complaints about his behavior. Sherman contends that he did not lie during the investigation, and that by accusing him of lying — and by forcing him to reveal to prospective employers that he had been fired for lying — Rinchem defamed him.

Rinchem moves for summary judgment. For the reasons that follow, the Court grants Rinchem's motion and dismisses Sherman's complaint.

## I.  BACKGROUND

From mid-2006 through December 2007, Sherman worked at Advanced Technology Materials, Inc. ("ATMI"), a company located in Bloomington, Minnesota. Sherman Dep. 36-37, 39. In late December 2007, Rinchem hired Sherman and several other ATMI employees to provide services to ATMI on an in-house basis. Sherman Dep. 36. At that point, Sherman became an employee of Rinchem. Sherman worked for Rinchem for less than four months — from December 26, 2007, until he was fired on April 22, 2008. Sherman Dep. 30.

Sherman had a "bad relationship" with one of his coworkers, Isabelle Thill.  Sherman Dep. 57.  Thill had worked with Sherman at ATMI and then, like Sherman, had been hired by Rinchem.  Thill Dep. 8.  On one or two occasions, Thill made an obscene gesture to Sherman, Sherman Dep. 26, and on April 11, 2008, she called him "weird," Sherman Dep. 55.  Sherman found Thill's remark offensive, Sherman Dep. 54, and, after giving her the silent treatment for a day, he asked her to apologize for calling him weird, Sherman Dep. 56, 59.  Thill did apologize, but Sherman found her apology to be sarcastic and insincere, Sherman Dep. 61, and he went back to giving her the silent treatment, Sherman Dep. 66.

Sherman was otherwise talkative with his coworkers, however, and he discussed with them, among many other things, the fact that two women had complained to the police about his alleged stalking of them.  Sherman rollerblades around Lake Nokomis in Minneapolis on nearly a daily basis.  In the course of his rollerblading, he occasionally strikes up conversations with women.  Two of these women later complained to the police that Sherman had stalked them.  Sherman Dep. 17-19.  Sherman told his coworkers that one of these women, Delaine Marie Hansen, had threatened to get a restraining order against him, and that the other woman — whom Sherman knew only as "Amy" — had complained to police about his conduct toward her.  Sherman Dep. 19-20.

In fact, though, Hansen did not merely *threaten* to get an order against Sherman.  She *obtained* a temporary restraining order — an order that was in effect for roughly five weeks before being vacated after Hansen failed to appear at a court hearing.  Sherman Dep. Ex. 9 at RINCHEM 000067.  Sherman claims that he was never given notice of this order — and,

throughout this litigation, Sherman has maintained that the order was not "valid" because it was served on him by publication, and not personally.  Sherman Dep. 76, 82, 246.

The temporary restraining order obtained by Hansen is one of three that have been issued against Sherman.  He and his ex-wife obtained restraining orders against each other prior to their divorce, and after the divorce was finalized, his ex-wife extended the order that she had obtained against Sherman.  Sherman Dep. 6-7.  Moreover, "long after" Sherman's divorce was finalized, his ex-wife's new husband, Ted Koukal, obtained a restraining order after Sherman called him an obscene name in a restaurant parking lot following a heated argument about what kind of dessert would be served for Sherman's son's birthday.  Sherman Dep. 7-8, 107-08, 172-73.

In April 2008, Rinchem received complaints about Sherman's behavior in the workplace. There is confusion in the record about who initially complained about Sherman.  Gwen Inman, Rinchem's director of human resources ("HR"), told Sherman that Thill had made the initial complaint.  Sherman Dep. 126.  But Tasha Budlong, another HR employee, testified that Sherman's immediate supervisor, Michelle Kohanek, made the first complaint.  Budlong Dep. 14.  It also appears that Holly Ellison, one of Sherman's coworkers, had independently informed Ryan Swainey (the manager of the warehouse at which Sherman worked) by e-mail that "we have a real situation here with Jeff."  Ellison Dep. 32; Ellison Dep. Ex. 1.

In response to these complaints, Rinchem issued an employee-counseling memorandum to Sherman on April 17.  In that memorandum, Sherman was informed that his coworkers had accused Sherman of "disruptive behavior at ATMI" and that Sherman would be placed on paid administrative leave while Rinchem investigated those accusations.  Sherman Dep. Ex. 10. Inman (the HR director) and Budlong (the HR employee) conducted the investigation.

Between April 17 and April 21, Budlong interviewed several of Sherman's coworkers. The interviews focused primarily on Sherman's interactions with Thill, but some of the employees who were interviewed mentioned Sherman's comments about restraining orders and the women whom he had allegedly stalked at Lake Nokomis. Budlong's notes reflect that Kohanek told her that Sherman "bragg[ed] to everyone about having restraining orders brought against him." Budlong Dep. Ex. 4 at RINCHEM 000165. Ellison told Budlong that she overheard Sherman talking to Kohanek about the restraining orders and at least one of the women at Lake Nokomis. Budlong Dep. Ex. 4 at RINCHEM 000166. Craig Phipps, another employee at the warehouse, also knew about the "stalking orders." Budlong Dep. Ex. 4 at RINCHEM 000167. Even the FedEx driver who serviced the warehouse knew about Sherman's negative experiences with women at Lake Nokomis. Sherman Dep. Ex. 22.

Inman interviewed Sherman on Friday, April 18. Sherman Dep. 125. She asked Sherman if he had ever made unwanted advances toward Thill, or contacted or attempted to contact Thill outside of work. Sherman Dep. 126. Inman's questions led Sherman to believe that he was being investigated for sexual harassment. Sherman Dep. 128. Inman did not ask Sherman about the restraining orders during the interview on Friday, April 18. Sherman Dep. 130.

Inman again interviewed Sherman on Monday, April 21. Sherman Dep. 130. Sherman asked Inman about the status of her investigation, and Inman replied that she was "in a bit of a quandary" because she didn't "have anything yet." Sherman Dep. 132. She then asked Sherman if he had ever been the subject of a restraining order. Sherman Dep. 132.

The record is not clear as to precisely what Sherman said in response to Inman's question.  In a letter to Rinchem dated April 23, 2008 — just two days after his conversation with Inman — Sherman described his response as relating to "whether anyone has had a restraining order against me unrelated to my divorce."  Sherman Dep. Ex. 9 at RINCHEM 000063; *see also* Sherman Dep. Ex. 9 at RINCHEM 000059, 000060; Sherman Dep. Ex. 25.  More than two years later, though, Sherman changed his story at his deposition.  Sherman testified that he had told Inman that the only restraining orders that had been entered against him were restraining orders that had been obtained "[by] my ex-wife and her husband."[1]  Specifically, Sherman testified as follows:

> Q:    Did you tell anyone at Rinchem — did you tell Ms. Inman that you never had any restraining orders against you unrelated to your divorce?
>
> A:    I told her that the only people that did have restraining orders against me were my ex-wife and her husband.
>
> Q:    Well, now you're saying it differently than what you said in your appeal?
>
> A:    Well, that's what — yes.  I just went along with what Ms. Inman said.
>
> Q:    What do you mean?
>
> A:    She used the words related to my divorce.
>
> Q:    Okay.
>
> A:    That wasn't —

---

[1]This is different from saying that the only restraining orders that had been entered against Sherman were restraining orders "related to my divorce" because, as the Court will discuss below, the restraining order obtained by the husband of Sherman's ex-wife was not "related" to his divorce.

Q:     Well, let's just get to it.  What's the question that Ms.
        Inman asked you?

A:     About restraining orders?

Q:     Yes.

A:     She asked me whether I had ever received any restraining
        orders.

Q:     And what was your answer?

A:     I said no, except for my — my ex-wife and her husband.

Q:     Those were your exact words?

A:     Yes.

Q:     Is it possible you said no, except related to my divorce?

A:     Nope.  Those were my exact words.  I specifically stated
        who they were.

Sherman Dep. 99-100.

After Sherman responded to Inman's question about restraining orders — either by

saying that only his ex-wife and her husband had obtained restraining orders against him, or by

saying that only restraining orders related to his divorce had been obtained against him — Inman

asked Sherman if he was certain that no other restraining orders had been obtained against him.

Sherman vigorously denied that possibility.  Sherman Dep. 132.  Sherman denies that Inman

asked him any other questions about restraining orders.  Sherman Dep. 134-35.

Later that day, Sherman received a voice mail from Swainey (the site manager) asking

him to attend an 8:30 a.m. meeting the next morning (Tuesday, April 22), so that they could

discuss the results of the investigation.  Sherman Dep. 137; Sherman Dep. Ex. 11.  Present at the

meeting were Sherman, Swainey, and James Carter (a coworker of Sherman's).   Budlong

participated in that meeting by telephone.

At the meeting, Swainey told Sherman that Rinchem had decided to fire him.   Swainey

read aloud from an employee-counseling memorandum written by Inman and dated April 21,

2008.   This memorandum — which is the subject of Sherman's defamation claim in this action

— said in relevant part:

> Jeff has created a disruptive work environment by telling fellow
> employees about non-work related questionable activities.   During
> the course of the investigation, it was discovered that more than
> two employees heard Jeff talking about restraining orders that had
> been filed against him from women he had met during chance
> outdoor activities.   With two of these employees, Jeff actually
> openly discussed these restraining orders.   Female employees
> became concerned about his constant attentions and discussions
> relating to one of the female employees at Rinchem.
>
> . . .
>
> While there were several credible concerns brought out during the
> course of the investigation[,] our biggest concern is that Jeff was
> not forthcoming with all pertinent information.   During the
> investigation the Director of Human Resources, Gwen Inman,
> asked Jeff several questions relating to the allegations that were
> brought out; including his discussions about restraining orders.
> Jeff indicated that the only restraining orders that he had received
> were those relating to his divorce.   Upon examination of the other
> statements made during the investigation, this is obviously not the
> same information he had given others.   It is our decision that Jeff
> has obviously lied to the Director of HRD during the course of this
> investigation.

Sherman Dep. Ex. 5.  The memorandum further stated that Rinchem was terminating Sherman's employment, effective immediately, for "[t]heft or [o]ther [a]cts of [d]ishonesty," *id*., which Sherman understood to mean lying about the restraining orders.[2]  Sherman Dep. 139.

Sherman asked Budlong how he could appeal Inman's decision.  Sherman Dep. 138. Budlong told Sherman that he could send a letter to Rinchem explaining his side of the story.  *Id*. According to Sherman, Budlong also told him that he could have his job back if he could prove that he did not have any additional restraining orders and if his job were still available.  *Id*.

The following day — April 23 — Sherman appealed his termination.  Sherman Dep. Ex. 9.  In his letter to Rinchem, Sherman stated, "I have been accused of lying about whether a

---

[2]Rinchem now contends that it did not fire Sherman because he lied about the *existence* of restraining orders issued against him, but because he lied by denying that he had *discussed* those restraining orders with his coworkers.  *See* Sherman Dep. Exs. 9, 14, and 17.  Sherman insists that Inman did not even ask him about whether he had discussed restraining orders with his coworkers, and thus he could not have lied to her about such discussions, and a lie about such discussions could not have been the reason he was fired.  Sherman Dep. 103-04.

For purposes of ruling on Rinchem's summary-judgment motion, the Court must, of course, assume that Sherman's version is true.  It should also be noted that the April 21 memorandum seems to support Sherman's version.  Again, the memorandum said:

> Jeff indicated that the only restraining orders that he had received were those relating to his divorce.  Upon examination of the other statements made during the investigation, this is obviously not the same information he had given others. It is our decision that Jeff has obviously lied . . . .

Sherman Dep. Ex. 5.  There is no hint in this passage that Sherman was fired for lying about whether he *discussed* the restraining orders with his coworkers.  To the contrary, this passage states that Sherman was fired for lying about the *existence* of restraining orders.  The passage says, in successive sentences:  (1) that Sherman told Inman that the "only" restraining orders that had been entered against him were restraining orders related to his divorce; (2) that this statement — i.e., a statement about the *existence* of restraining orders — was inconsistent with "information he had given others"; and thus (3) that Rinchem decided that "Jeff has obviously lied."

restraining order has ever been issued against me that was unrelated to my divorce.

I ABSOLUTELY HAVE NOT HAD A RESTRAINING ORDER ISSUED AGAINST ME

OUTSIDE OF MY DIVORCE PROCEEDINGS." Sherman Dep. Ex. 9. Purportedly as proof,

Sherman attached a court order that had *vacated* the temporary restraining order that had been

obtained by Hansen, one of the women whom Sherman allegedly stalked at Lake Nokomis.

Sherman Dep. Ex. 9 at RINCHEM 000067. This order, of course, proved that a restraining order

unrelated to Sherman's divorce *had* been entered against him. But Sherman nevertheless

insisted that the order "vindicates me and shows that I haven't lied. I HAVE NEVER HAD A

RESTRAINING ORDER ISSUED AGAINST ME OUTSIDE OF MY DIVORCE." Sherman

Dep. Ex. 9 at RINCHEM 000060. Rinchem considered and rejected Sherman's appeal. Second

Inman Aff. ¶ 5 [Docket No. 31]; Second Inman Aff. Ex. 1.

On June 10, 2008, Sherman sent a letter to Rinchem threatening to sue the company for

defamation and giving the company one last chance to reinstate him. Sherman Dep. Ex. 24.

Rinchem refused to reinstate Sherman, but it did inform him that it had revised the April 21

memorandum. Sherman Dep. Ex. 17. As noted, that memorandum had said that Sherman was

being fired for lying. Rinchem revised the memorandum so that it said that Sherman was being

fired because of an unspecified "change of corporate direction." Sherman Dep. Ex. 17.

Sherman estimates that between April 21, 2008 and his deposition on November 8, 2010,

he applied for about 350 different jobs. Sherman Dep. 191. In connection with this litigation,

Sherman produced about 200 cover letters that he sent to prospective employers. In about a

quarter of those letters, Sherman volunteered that he was fired from his previous job for lying.

*See* Sherman Dep. Ex. 18. Sherman said that he refused to tell prospective employers that he

had been terminated because of a change in corporate direction, because that was a lie, and

because repeating that lie to prospective employers would "conflict with [his] moral dignity."

Sherman Dep. Ex. 25.  In one application, though, Sherman did state that he had left Rinchem

due to a "change of corporate direction."  Sherman Dep. Ex. 18 at B00444.

By the time of his deposition, Sherman had interviewed with 27 prospective employers.

Sherman Dep. 191.  One of those interviews occurred prior to Rinchem's revision of the April 21

memorandum; it is not clear whether, at that interview, Sherman disclosed that he had been fired

for lying.  Sherman Dep. 243.  In all but one or two of the 27 interviews, Sherman was asked

why he left his position at Rinchem.  Sherman Dep. 191.  In some cases Sherman told the

interviewer that he had been fired for lying; in other cases, he initially told the interviewer that

he had left Rinchem due to a change in corporate direction, but the interviewer asked what that

meant, and Sherman responded by explaining that he had been fired for lying.  Sherman

Dep. 185, 243.

Sherman filed this lawsuit against Rinchem in March 2010.  In his complaint, Sherman

alleged that Rinchem had slandered and defamed him when it fired him for lying, breached its

contract with him by retaliating against him for participating in Rinchem's investigation of his

workplace conduct, and intentionally interfered with a prospective economic advantage or

contractual relation by failing to correct its defamatory statements.  Amended Compl. Counts I-

III.

Following discovery, both Rinchem and Sherman moved for summary judgment.

Rinchem sought summary judgment on the merits; Sherman sought summary judgment as a

sanction for spoliation of evidence.  Rinchem also moved to exclude certain expert testimony

offered by Sherman.  The Court held a lengthy hearing on all three motions.  Shortly after that hearing, the Court entered an order denying Sherman's summary-judgment motion without prejudice, granting Rinchem's motion to exclude the expert testimony, and taking Rinchem's summary-judgment motion under advisement.  Docket No. 50.

Only Sherman's defamation claim merits substantial discussion.  His breach-of-contract claim is premised on the allegation that Rinchem's employee handbook constitutes a contract. But the employee handbook contains a disclaimer cautioning that it is *not* a contract and that Sherman and his co-workers are at-will employees.  Sherman Dep. Ex. 26 at RINCHEM 000230. Such disclaimers are common in employee handbooks, and "[c]ourts applying Minnesota law have repeatedly held that the inclusion of such a disclaimer precludes a handbook from creating contractual obligations, even where the handbook contains specific provisions that would otherwise be considered contractual."  *Nabry v. MV Transp., Inc.*, No. 07-CV-0124 (PJS/JJG), 2007 WL 4373107, at *2 (D. Minn. Dec. 13, 2007).  Sherman candidly acknowledged at oral argument that his breach-of-contract claim was not viable in light of the disclaimer.

Sherman also candidly acknowledged at oral argument that his claim for interference with a prospective economic advantage was simply another way of pleading his defamation claim.  The Court will therefore dismiss the intentional-interference claim as redundant, *see* Fed. R. Civ. P. 12(f), and focus only on the defamation claim.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.

### B.  Defamation

Under Minnesota law, a statement is defamatory if it "disgraces and degrades the plaintiff, holds him up to public hatred, contempt or ridicule" or "harm[s] the plaintiff's reputation and lower[s] the plaintiff in the estimation of the community."  *Stuempges v. Parke, David & Co.*, 297 N.W.2d 252, 255 (Minn. 1980).  To recover for defamation, Sherman must prove that Rinchem made a statement (1) that was false; (2) that was communicated to a third party; and (3) that tends to harm his reputation.  *See Bol v. Cole*, 561 N.W.2d 143, 146 (Minn. 1997); *Cavanaugh v. Burlington Northern R.R. Co.*, 941 F. Supp. 872, 879 (D. Minn. 1996).  Minnesota law also requires that defamation claims be pleaded with specificity.  *Am. Book Co. V. Kingdom Pub. Co., Inc.*, 73 N.W. 1089, 1090 (Minn. 1898) ("It is well settled that the specific words which have been published must be set out.  It is not sufficient merely to state the effect of the language, or that the publication was of a certain defamatory tenor and import."); *Pope v.*

*ESA Servs., Inc.*, 406 F.3d 1001, 1011 (8th Cir. 2005) (stating that a libel plaintiff must, at minimum, "allege who made the allegedly libelous statements, to whom they were made, and where.").

Rinchem argues that it is entitled to summary judgment on Sherman's defamation claim for four reasons: (1) because Sherman did not plead the claim with the requisite specificity; (2) because Rinchem's statement was true; (3) because Rinchem's statement is protected by a qualified privilege; and (4) because Rinchem's statement was not communicated to a third party.

### 1. Specificity

Rinchem argues, first, that Sherman's defamation claim fails because he has not pleaded his claim with the specificity required by Minnesota law.

Rinchem's argument is untimely. The proper vehicle for challenging a complaint as insufficiently specific is a Rule 12 motion filed shortly after the complaint is served, not a Rule 56 motion filed months later at the close of discovery. After all, a defendant who is complaining about a lack of specificity is complaining that it cannot be expected to defend a claim until it is given more information about that claim. It is difficult to take such a complaint seriously after the defendant has defended the claim for several months.

Moreover, even if Rinchem's challenge was timely, the Court would reject it. Sherman's amended complaint quotes the allegedly defamatory statement verbatim, identifies the date on which the statement was made, and describes the context surrounding the statement. Amended Compl. ¶¶ 33-36. Rinchem could not have failed to understand that Sherman was challenging the April 21 memorandum — and, in particular, its assertion that Sherman had lied in the course of the investigation of the complaints about his behavior. Indeed, it is clear that Rinchem *did*

understand that this was the basis of Rinchem's defamation claim.  In June 2008, when Sherman

threatened to sue Rinchem for defamation, Rinchem responded by revising the April 21

memorandum to remove the reference to Sherman's lying.  And during Sherman's deposition,

Rinchem focused on the April 21 memorandum and on the statements that Sherman made to

Inman in the course of her investigation.  Sherman's defamation claim was adequately pleaded.

### 2.  Truth

Sherman's defamation claim is based on Rinchem's statement that Sherman lied to Inman

during the course of her investigation of the complaints about his behavior.  Specifically,

Sherman alleges that Rinchem defamed him on April 22 when it read aloud Inman's April 21

memorandum in which she accused him of lying about the restraining orders.  Rinchem argues

that Sherman's defamation claim must be dismissed because Inman's statement is *true* —

because Sherman *did* lie to her about the restraining orders — and a "true statement cannot be

defamatory."  *Granig v. Sherburne Cnty.*, 172 F.3d 611, 617 (8th Cir. 1999).

The parties dispute what Sherman said to Inman.  Inman testified that Sherman told her

that he did not have "any restraining orders outside of his divorce."  Inman Dep. 66.  Sherman

has, at times, used similar language; for example, in the appeal that he sent to Rinchem the day

after he was fired, Sherman said that he had never been the subject of any restraining order

"outside of my divorce proceedings."  If that is what Sherman said to Inman, then a reasonable

jury would have to find that he lied.  Sherman admits that he was aware of the restraining order

that had been obtained by his ex-wife's husband; that the restraining order was obtained "long

after" his divorce was final; and that the restraining order was obtained in response to a heated

argument in a restaurant parking lot about what kind of dessert to serve for Sherman's son's

birthday.  Sherman Dep. 107-08, 173.  A reasonable jury would have to find that the restraining

order obtained by Sherman's ex-wife's husband was "outside of his divorce proceedings."

Sherman's argument to the contrary — that the order related to his divorce proceedings because

"[i]f I had still been married, you know, I would have never met her husband" —  is frivolous.

Sherman Dep. 8.

 The problem for Rinchem is that Sherman denies that he told Inman that no restraining

orders had been obtained against him except in connection with his divorce proceedings.

Instead, Sherman alleges that he told Inman that the only restraining orders that had been entered

against him were orders obtained by his "ex-wife and her husband."  For purposes of ruling on

Rinchem's summary-judgment motion, the Court must assume that Sherman's version of events

is true.

 If Sherman indeed told Inman that only his ex-wife and her husband had obtained

restraining orders against him, then Sherman's statement was false.  Delaine Hansen obtained a

temporary restraining order against Sherman — an order that was in effect for about five weeks

— and Hansen is neither Sherman's ex-wife nor her husband.  But uttering a statement that is

*false* is not the same thing as telling a *lie*.  A lie is "[a] false statement deliberately presented as

being true."  *American Heritage Dictionary of the English Language* 1010 (4th ed. 2000).  A

false statement is a lie only if it is "known or believed by the speaker to be untrue."  *Webster's*

*Third New International Dictionary* 1305 (1981).

 Sherman's statement that only his ex-wife and her husband had obtained restraining

orders against him was untrue, but a reasonable jury could find that Sherman did not *know* that

his statement was untrue.  When Sherman appealed Rinchem's decision to fire him, Sherman

-15-

provided Rinchem with a copy of the order that had vacated the temporary restraining order that Hansen had obtained.  Someone trained in the law would understand from this order that (1) Hansen had obtained a temporary restraining order; (2) the temporary restraining order had remained in effect for about five weeks; and (3) a judge had then terminated the temporary restraining order.

But Sherman is not trained in the law.  And his appeal to Rinchem appears to reflect a sincere belief that the attached order provided "proof" that Hansen had never obtained the restraining order that she had threatened to get.  Sherman Dep. Ex. 9.  In his appeal, Sherman argued that the order "vindicates me and shows that I haven't lied" about the non-existence of any restraining order, save the ones obtained by his ex-wife and her husband.  *Id*.  If Sherman did not believe what he said, then it would have made no sense for Sherman to provide Rinchem with a copy of the order.

At his deposition, Sherman also seemed to be oblivious to the fact that Hansen had obtained a temporary restraining order against him:

> Q:     And so Ms. Hansen got a temporary restraining order
> against you on August 14, correct?
>
> A:     No.
>
> Q:     Why do you say that's not correct?
>
> A:     For a restraining order to be valid it would have to be
> served.  It was never served.
>
> . . .
>
> I'm saying if they say there was a temporary restraining
> order in effect, that is inaccurate.

Sherman Dep. 82-83.

In sum, Sherman has sued Rinchem because it accused him of lying to Inman.  A reasonable jury that credited Sherman's version of events would have to find that Sherman made a statement to Inman that was false, but such a jury would not have to find that Sherman made a statement that was a lie.  Thus Rinchem is not entitled to summary judgment that its allegedly defamatory statement — its statement that Sherman lied to Inman — was true.

### 3.  Qualified Privilege

Rinchem argues that it is entitled to summary judgment on Sherman's defamation claim for a third reason: because its assertion that Sherman lied to Inman was protected by a qualified privilege.  For an allegedly defamatory statement to be protected by a qualified privilege, the statement must be made in good faith and on a proper occasion, from a proper motive, and with reasonable or probable cause.  *Bol v. Cole*, 561 N.W.2d 143, 149 (Minn. 1997).  "Qualified privilege applies when a court determines that 'statements made in particular contexts or on certain occasions should be encouraged despite the risk that the statements might be defamatory.'"  *Id.* (quoting *Lewis v. Equitable Life Assurance Soc'y of the U.S.*, 389 N.W.2d 876, 889 (Minn. 1986)).  The defendant bears the burden of establishing the existence of a qualified privilege.  *Keenan v. Computer Assocs. Int'l, Inc.*, 13 F.3d 1266, 1269 (8th Cir. 1994).  Whether the statements were made on a proper occasion and from a proper motive are always questions of law.  *Id.* at 1270.  Whether the defendant had a reasonable basis for making the statement is a question of fact — although, as with any question of fact, if a reasonable jury could answer the question only one way (as is often the case), a court can grant summary judgment on the question.  *Id.*

The Court has no trouble concluding that when Rinchem told Sherman why he was being fired, Rinchem's statement was made on a proper occasion.  Under Minnesota law, a statement made by an employer to an employee about why the employee is being fired is made upon proper occasion.  *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 144 (Minn. 1986). Likewise, a statement made by a former employer to a prospective employer about why an employee was fired is made upon proper occasion.  *Stuempges,* 297 N.W.2d at 257.  This reflects the conclusion of the Minnesota Supreme Court that an "employer has an important interest in protecting itself and the public against dishonest or otherwise harmful employees." *McBride v. Sears, Roebuck & Co.*, 235 N.W.2d 371, 374 (Minn. 1975).  Rinchem's statement, originally made in Sherman's termination memorandum and later repeated by Sherman in job interviews, is exactly the type of statement that the qualified privilege is meant to protect.

The Court also has no trouble concluding that Rinchem's statement was "based upon reasonable or probable cause."  *Bol*, 561 N.W.2d at 149 (internal quotation omitted).  On Sherman's version of events, Sherman was fired for telling Inman that he had not been subject to any restraining order except the orders obtained by his ex-wife and her husband.  Yet it is undisputed that Sherman's co-workers told Rinchem that Sherman had informed them that he had been subject to a restraining order that was *not* obtained by his ex-wife or her husband — specifically, a restraining order that was obtained by a woman who had accused Sherman of stalking her.  Nothing in the record suggests that it was unreasonable for Inman to rely on those accounts of Sherman's coworkers.  Thus, the reports of Sherman's coworkers provided probable cause for Rinchem to conclude that Sherman lied to Inman when he told her that the only

restraining orders that had been issued against him were the orders obtained by his ex-wife and her husband.

Because Rinchem has established that its statement is protected by a qualified privilege, the burden shifts to Sherman to show that Rinchem made the statement with actual malice. *Lewis*, 389 N.W.2d at 890. Malice is defined as "actual ill will, or a design causelessly and wantonly to injure plaintiff." *McBride*, 235 N.W.2d at 375. Malice may be proved by evidence that the defendant knew that the statements were false or by "'extrinsic evidence of personal ill feeling, or by intrinsic evidence such as the exaggerated language of the libel, the character of the language used, the mode and extent of publication, and other matters in excess of the privilege.'" *Frankson*, 394 N.W.2d at 144 (quoting *Friedell v. Blakely Printing Co.*, 203 N.W. 974, 976 (1925)); *Keenan*, 13 F.3d at 1270.

Malice is generally an issue for the jury, but a court can grant summary judgment on the issue of malice if there is insufficient evidence to raise a genuine question of fact. *Bol*, 561 N.W.2d at 150; *see also Frankson*, 394 N.W.2d at 144-45 (overturning a jury's verdict because there was insufficient evidence of malice). Moreover, malice cannot be implied from the mere fact that a statement was inaccurate. Otherwise, the qualified privilege would protect only true statements — that is, statements that are not defamatory in the first place. *Bol*, 561 N.W.2d at 150.

Based on the evidence in the record, a reasonable jury could not find that Inman acted with malice when she wrote in the April 21 memorandum that Sherman had lied to her about the existence of restraining orders against him. The record contains no extrinsic evidence that Inman had any personal or professional ill will toward Sherman. Inman worked in Rinchem's

headquarters in New Mexico, Inman Dep. 6, while Sherman worked in Minnesota and had been employed by Rinchem for only a few months.  Indeed, Inman and Sherman had met only once.  Sherman Dep. 122-23.  In all of her dealings with Sherman, Inman was calm, polite, and professional.  Nothing in the record suggests that Inman was anything but an HR director fulfilling her responsibility to investigate complaints of workplace misconduct and make decisions about the status of accused employees.

Likewise, there is no intrinsic evidence of malice on Inman's part, such as "'the exaggerated language of the libel, the character of the language used, the mode and extent of publication, and other matters in excess of the privilege.'" *Frankson*, 394 N.W.2d at 144 (quoting *Friedell*, 203 N.W. at 976).  Nothing about the language of the April 21 memorandum is exaggerated or otherwise reflective of ill will, and the only "publication" by Rinchem of the memorandum occurred in a private meeting between Sherman and Rinchem officials.  To this day, there is no evidence that *Rinchem* has told anyone but Sherman that it found that Sherman had lied to Inman.

In arguing that Inman acted with malice when she accused him of lying in the April 21 memorandum, Sherman relies on three things:

First, Sherman argues that when Rinchem revised the April 21 memorandum to remove any reference to his lying, Rinchem was admitting that it knew that its accusation was false.  But the revision was made in June 2008 — two months *after* Inman drafted the April 21 memorandum — and it was plainly made in response to Sherman's explicit threat to sue Rinchem for defamation.  Rinchem's action was obviously motivated by a desire to avoid litigation; there is no hint in the record that Rinchem went back, looked again at the evidence,

and concluded not only that Inman's statement was false, but that Inman *knew* that it was false at the time that she wrote it.

Second, Sherman argues that malice can be inferred from the fact that Inman cannot find the handwritten notes that she took during her conversations with Sherman.  Inman Dep. 76. Sherman speculates that Inman must have deliberately destroyed her notes.  Inman does not know what happened to her notes, but she speculates that the notes were lost as a result of personnel turnover in Rinchem's human-resources department or as a result of the human-resources department relocating from one building to another.  Second Inman Decl. ¶ 5 [Docket No. 41].  Nothing in the record casts any doubt on Inman's sworn testimony that she did not deliberately destroy her notes.

Finally, in arguing that Inman acted with malice, Sherman points to some confusion in the record about exactly when Inman decided to fire Sherman.  Inman testified, consistent with Rinchem's response to Sherman's interrogatories, that she made "a final determination" to fire him on Sunday, April 20.  Inman Dep. 108.  But she also suggested that she wanted to continue investigating even after making her final determination, and that she did not make a *final* final determination until Monday, April 21 — the date of her conversation with Sherman in which she asked him about restraining orders.  Inman Dep. 109, 111, 112; Sherman Dep. 130-32.  Sherman argues that, if a jury concludes that Inman decided to fire him on Sunday — before talking to him about the restraining orders on Monday — the jury could find that Inman did not really fire him for lying, as she claimed in the April 21 memorandum.

It is true that Inman's confused testimony might give a jury reason to doubt that Inman's real reason for firing Sherman was the alleged lie that he told about the restraining orders.  But

Sherman is bringing a defamation claim, not a discrimination claim.  Whether the reason given for firing Sherman was pretextual is irrelevant.  Sherman's defamation claim is not based on an allegedly false statement that Inman made about her *motives* for firing Sherman; Sherman's defamation claim is based on an allegedly false statement that Inman made about *Sherman* — specifically, her assertion that Sherman had lied about the restraining orders.  As noted, prior to Sherman being fired for lying on April 22, Inman asked him about restraining orders, Sherman denied being subject to any restraining orders except those obtained by his ex-wife and her husband, and Sherman's coworkers told Rinchem that Sherman had talked of being subject to a restraining order that was *not* obtained by either his ex-wife or her husband.  In light of that evidence — all of which is either undisputed or reflects Sherman's version of events — a jury could not find, based solely on Inman's confused testimony about the timing of her final decision to fire Sherman, that Inman acted with malice when she wrote in the April 21 memorandum that Sherman had lied about the restraining orders.

In sum, even if Inman's statement that Sherman had lied about the restraining orders was false, that statement was protected by a qualified privilege, and the evidence before the Court would not allow a reasonable jury to find that Inman acted with malice in writing that statement. Rinchem is therefore entitled to summary judgment on Sherman's defamation claim.

### 4.  Compelled Self-Publication

Rinchem alleges that it is entitled to summary judgment for another reason: because the evidence submitted by Sherman is inadequate to allow a reasonable jury to find that the allegedly defamatory statement was published to a third party.  The Court agrees.

-22-

There is no evidence that Rinchem itself ever published the allegedly defamatory statement to anyone but Sherman.  Sherman therefore relies on Minnesota's doctrine of compelled self-publication, which applies when the "plaintiff was compelled to publish a defamatory statement to a third person [and] it was foreseeable to the defendant that the plaintiff would be so compelled."  *Lewis*, 389 N.W.2d at 888.  The Minnesota Supreme Court has warned that the doctrine of compelled self-publication "should be cautiously applied" and that the doctrine should be limited to situations in which the defamation plaintiff "has no reasonable means of avoiding publication of the statement or avoiding the resulting damages."  *Id.*

As an initial matter, the Court rejects Rinchem's argument that Sherman cannot rely on the doctrine of compelled self-publication because Rinchem amended the April 21 memorandum to change the reason for Sherman's firing from lying to a "change of corporate direction."  The fact remains that Sherman *was* fired for lying, and that he was *not* fired because of a change in corporate direction.  When Sherman was asked by a prospective employer why he was fired by Rinchem, he was entitled to answer truthfully.  "Fabrication … is an unacceptable alternative" to self-publication.  *Lewis*, 389 N.W.2d at 888.

Nevertheless, Sherman has failed to submit sufficient evidence that he was compelled to "self-publish" the accusation that he had lied about the restraining orders.  In the substantial majority of cases in which Sherman disclosed to prospective employers that Rinchem had fired him for lying, Sherman volunteered that information in his cover letter.  Those disclosures were not "compelled."  Nothing prevented Sherman from submitting a standard cover letter expressing his interest in a position and saying nothing about being fired from his previous job.  Indeed, in most of Sherman's cover letters, he avoided any reference to the reason he left Rinchem, or

wrote that the most recent gap in his employment history was due to "circumstances beyond [his] control." *See, e.g.*, Sherman Dep. Ex. 18 at B00504.

Sherman contends that he disclosed Rinchem's accusation not merely in his cover letters, but also in response to questions asked by prospective employers. Such disclosures might be compelled, but Sherman has provided almost no evidence about any of these alleged disclosures. "Under Minnesota law, a plaintiff seeking to recover for defamation must, at a minimum, identify who made the allegedly defamatory statements, to whom they were made, and when." *Chial v. Sprint/United Mgmt. Co.*, No. 07-CV-0123 (PJS/RLE), 2008 WL 906800, at *6 (D. Minn. Apr. 1, 2008). Sherman has provided the Court with next to no information about how, exactly, the issue of his separation from Rinchem was raised by prospective employers. Indeed, Sherman has not even identified the prospective employers who interviewed him (with one exception, Sherman Dep. 243).

Sherman has provided even less information about his allegedly compelled self-publication than did the plaintiff in *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406 (Minn. 1994). The *Rouse* plaintiff identified by name 13 prospective employers with whom he interviewed and provided a few other details, such as some of the companies' locations and whether certain interviewers were men or women. *Rouse*, 520 N.W.2d at 411. The Minnesota Supreme Court held that this level of detail was insufficient to support a finding that the plaintiff was compelled to disclose the reason that he had been fired from a previous job. *Id.* If Rouse's claim had to be dismissed, so, too, must Sherman's.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT defendant's motion for summary judgment [Docket No. 28] is

GRANTED, and plaintiff Jeffrey Scott Sherman's complaint is DISMISSED WITH

PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August  8 , 2011                                    s/Patrick J. Schiltz
                                                           Patrick J. Schiltz
                                                           United States District Judge